```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA


   SOLSTICE OIL & GAS I LLC                CIVIL ACTION

   VERSUS                                  NO: 12-2417

   OBES INC. ET AL.                        SECTION: "J" (5)
```

### ORDER & REASONS

Before the Court is a *Motion for Summary Judgment* **(Rec. Doc. 152)** filed by Third-Party Defendant JAM Petroleum, LLC (JAM), Third-Party Plaintiff OBES, Inc. (Ole Brook)'s opposition thereto (Rec. Doc. 174), and JAM's reply. (Rec. Doc. 191) Having considered the parties' submissions, the record, and the applicable law, the Court finds, for the reasons expressed below, that the motion should be **GRANTED**.

### FACTS AND PROCEDURAL BACKGROUND

This action arises out of the drilling of the ML Mann et al. No. 1 Well in West Avondale Field, St. Charles Parish, Louisiana. On August 15, 2011, JAM and Solstice Oil & Gas, LLC (Solstice) entered into a Joint Operating Agreement (JOA) regarding the establishment of oil and gas leases. The JOA provides that JAM is the Operator of leases formed under the agreement, and Solstice is a non-operating interest-holder.

In its role as Operator, JAM contracted with Ole Brook to provide JAM and Solstice with a directional driller and directional driller services. The two companies entered into a

Master Service Agreement (MSA) on October 31, 2011, for work on the Well. The MSA contains two provisions describing the indemnity obligations of JAM and Ole Brook. Paragraph 11(a) addresses Ole Brook's indemnity obligation as to JAM.

> 11.(a) Contractor agrees to indemnify, defend and save harmless Company Group from and against any and all claims, losses, expenses (including without limitation all costs, demands, damages, suits, judgments, fines, penalties, liabilities, debts, attorneys' fees, and causes of action of whatsoever nature or character, whether known or unknown and including without limitation claims, losses, or expenses for property damage, bodily injury, illness, disease, death, pollution or loss of services, wages, consortium and society) in any way, directly or indirectly arising out of, or related to, the performance or subject matter of this Agreement, or the ingress or egress, or presence on any premises (whether land, building, vehicle, platform, aircraft, vehicle, or otherwise) owned, operated, chartered, leased, used, controlled, or hired by Company Group or Contractor, and which are asserted by or arise in favor of any person, entity, or governmental agency (including without limitation, Company, Contractor, and the contractors or subcontractors of each, and any employees, including the direct or borrowed employees of Contractor, even if determined to be borrowed employees of Company and/or their spouses, relatives, dependents, or estates), excepting only direct employees of Company and expressly including any claims, losses, or expenses actually or allegedly caused by the sole, concurrent, or partial negligence (of whatever nature or character), fault or strict liability of Company Group or any other person or the unseaworthiness or unairworthiness of vessels or craft, whether or not preceding the execution of this Agreement.

(Rec. Doc. 107-3, p. 2) Paragraph 11(b) provides JAM's obligation to indemnify Ole Brook.

> 11.(b) Company agrees to indemnify, defend and save harmless Contractor from and against any and all claims, losses, expenses (including without limitation all costs, demands, damages, suits, judgments, fines, penalties, liabilities, debts, attorneys' fees, and causes of action of whatsoever nature or character, whether known or unknown and including without limitation claims, losses, or expenses for property damage, bodily injury, illness, disease, death, pollution or loss of services, wages, consortium and society) in any way, directly or indirectly arising out of, or related to, the performance or subject matter of this Agreement, or the ingress or egress, or presence on any premises (whether land, building, vehicle, platform, aircraft, vehicle, or otherwise) owned, operated, chartered, leased, used, controlled, or hired by Company Group or Contractor, and which are asserted by or arise in favor of Company's direct employees (and/or their spouses, relatives, dependents, or estates), expressly including any claims, losses or expenses actually or allegedly caused by the sole, concurrent, or partial negligence (of whatever nature or character), fault or strict liability of Contractor or any other person or the unseaworthiness or unairworthiness of vessels or craft, whether or not preceding the execution of this Agreement.

(Rec. Doc. 107-3, p. 2) The MSA defines "Company" as JAM Petroleum LLC; "Contractor" as Ole Brook Directional Services; and "Company Group" as "all affiliated or related companies, and its and their working interest owners, co-lessees, co-owners, partners, joint operators, joint venturers, contractors and subcontractors, and the agents, officers, directors, and employees of all of the foregoing." (Rec. Doc. 107-3, p. 1)

Additionally, JAM and Ole Brook included a Choice of Law provision in the MSA. Specifically, the parties agreed that

3

Oklahoma law would govern the MSA and any claims deriving therefrom.

> This Agreement and all matters pertaining hereto or arising hereunder, including without limitation matters of performance, non-performance, rendition and supplying of and payment for goods and/or services, breach, remedies, procedures, rights, duties, obligations, interpretation and construction, shall be governed and determined by the laws of the State of Oklahoma without regard to or application of its conflicts of laws or decisions which would otherwise prescribe application of the laws of another state.

(Rec. Doc. 107-3, p. 3)

The drilling of the Well did not go as planned, and on October 1, 2012, Solstice filed suit against Ole Brook. Solstice alleges that Ole Brook did not drill the Well according to specifications. Consequently, Solstice claims Ole Brook breached its obligations under the MSA, industry standards, and the standard of performance warranted in the MSA. Ole Brook denied the allegations in the complaint and filed a third-party complaint against JAM, its member companies, and insurers for declaratory judgment, counter-claims, and cross-claims. In the complaint, Ole Brook alleged (1) that JAM is liable for the claims that Solstice asserts against Ole Brook because JAM's negligence caused Solstice's damages, (2) that JAM is obligated to defend and indemnify Ole Brook under the terms of the MSA, (3) a breach of contract claim against JAM under the MSA, and (4) a claim to enforce a default judgment that the Twenty-Ninth

4

Judicial District Court for the Parish of St. Charles, State of Louisiana entered in favor of Ole Brook and against JAM.

On August 26, 2014, JAM filed a *Motion for Summary Judgment* (Rec. Doc. 107), which the Court granted in part. (Rec. Doc. 130) The Court granted the motion with respect to Ole Brook's claims for tort contribution, legal indemnity, and contractual indemnity. The Court denied the motion as to Ole Brook's claim seeking to enforce a Louisiana state court judgment in its favor. The Court similarly denied the motion with respect to Ole Brook's breach of contract claim, finding that there existed a genuine issue of material fact as to whether Ole Brook's promise to indemnify JAM against JAM's own negligence was enforceable under Oklahoma law. The Court noted that JAM could reurge the motion following further discovery on this narrow issue.

On January 27, 2015, JAM filed the instant *Motion for Summary Judgment*. **(Rec. Doc. 152)** JAM argues that it is entitled to summary judgment as to Ole Brook's breach of contract claim because the additional discovery has established that the exculpatory clause is fully valid and enforceable under Oklahoma law. JAM further argues that the MSA does not indicate that JAM owes any obligation to Ole Brook that could give rise to a valid breach of contract claim here. Ole Brook opposed the motion on

February 6, 2015.[1] (Rec. Doc. 174) JAM replied on February 11, 2015. (Rec. Doc. 191)

## LEGAL STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citing FED. R. CIV. P. 56(c)); Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co., 530 F.3d 395, 398 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but a party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions. Little, 37 F.3d at 1075. A court ultimately must be satisfied that "a reasonable jury could not return a verdict for the nonmoving party." Delta, 530 F.3d at 399.

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed

---

[1] The Court extended the deadline for Ole Brook's opposition through and including February 6, 2015. (Rec. Doc. 163)

verdict if the evidence went uncontroverted at trial.'" Int'l Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257, 1263-64 (5th Cir. 1991) (citation omitted). The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." Id. at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. See Celotex, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. See id. at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. See, e.g., id. at 325; Little, 37 F.3d at 1075.

## PARTIES' ARGUMENTS AND DISCUSSION

**A. Validity and Enforceability of the Exculpatory Clause**

JAM argues that the exculpatory clause is valid and enforceable under Oklahoma law, rendering invalid Ole Brook's breach of contract claims against it. JAM contends that Ole Brook has essentially admitted that the clause at issue clearly

7

and unambiguously exonerates JAM with respect to Ole Brook's breach of contract claim. JAM likewise argues that the clause does not violate any public policy of the state of Oklahoma. JAM focuses on whether there was a vast difference in the bargaining power of the parties when they entered into the MSA.

JAM argues that the evidence elicited in discovery since the Court's previous Order reveals that the parties are in fact substantially similarly situated such that the exculpatory clause is enforceable. JAM is a small limited liability company having three members: Melton Petroleum, LLC, Hyperion Energy Corporation, and Silver Sage Investments. Each of these entities is composed of only one member: John Melton, Bob Rutter, and Tom Dirks, respectively. Melton, Dirks, and Rutter formed the partnership to drill the Well. Each contributed $50,000 to the partnership. The $150,000 in seed capital constituted JAM's sole assets. Because the Well was JAM's only project, JAM asserts that "the success or failure of [the] Well was critically important to JAM's economic well-being." (Rec. Doc. 152-1, p. 7) Additionally, "other than the contracted services of an accountant and executive administrators, like Sally Fletchinger, JAM had no employees." Id. at 6. Ole Brook is a similarly small limited liability company; its sole member is President Jamie Jones. Ole Brook has no direct employees, but contracts for the administrative services of Nelda Standard. Unlike JAM, however,

Ole Brook owned several valuable assets when it contracted with JAM, including "several mud motors, [measurement while drilling] equipment, a forklift, a trailer and two other vehicles." Id. at 7. The value of these assets roughly totaled $500,000. Further, Ole Brook performed multiple drilling jobs in 2011 grossing the firm $3,000,000 that year. Finally, JAM argues that the parties' similar bargaining power is evinced by: (1) JAM providing Ole Brook with an opportunity to review and negotiate the MSA; (2) JAM agreeing to the MSA despite the fact that Ole Brook's insurance coverage was less than the amount required by JAM's standard MSA; (3) Ole Brook having reviewed the MSA, including the exculpatory clauses, yet not requesting changes; and (4) Ole Brook commencing work on the project and had receiving payment all before returning the signed MSA.

Ole Brook counter argues that a genuine dispute of material fact exists as to whether the MSA was the result of an arm's length negotiation between similarly situated companies, precluding summary judgment. First, Ole Brook argues that the three men behind JAM—Rutter, Dirks, and Melton—are "men with significant business experience who run companies with greater business sophistication tha[n] Ole Brook." (Rec. Doc. 174, p. 3) Second, Ole Brook's president, Jamie Jones, maintains that "it was his impression that unless he agreed to the terms of the MSA, he would not get the work on the project." Id. at 4. Mr.

9

Jones is a high school graduate with two years of community college and operates out of a "double wide trailer." Thus, Ole Brook argues, "It is entirely reasonable that Mr. Jones felt he had a disparity in bargaining power and that if he wanted . . . the work, he had to sign the MSA as it was presented to him." Id. Third, Ole Brook insists that any reduction in the insurance limits was not a "concession" made by JAM during a negotiation, but came about when Ole Brook "advised of its insurance coverage limits" and JAM did not then act to require additional coverage. Id. at 5. Fourth, Ole Brook argues that it signed the MSA in advance of commencing work on the project despite JAM's contentions to the contrary.

In reply, JAM insists that Ole Brook has not raised any genuine dispute of *material* fact. "Namely, the 'feelings' of Jamie Jones that the MSA was a 'take it or leave it' contract, which are admittedly based solely on his historical perspective of working in the oilfield and not anything JAM did or did not do in this instance with this MSA, do not comprise *evidence* of there being a vast difference in bargaining power, which is the issue before the Court." (Rec. Doc. 191, p. 2) Additionally, JAM notes that "Ole Brook fails altogether in its Opposition to cite to any evidence suggesting that the economic well-being of Ole Brook, a company with assets of $500,000 and $3 million in

revenue, was dependent on the directional drilling job at issue." Id.

An exculpatory clause is enforceable under Oklahoma law if "(1) the 'clause clear[ly] and unambiguous[ly]' exonerates the defendant with respect to the claim; (2) there was 'no vast difference' in the bargaining power of the parties when they entered into the contract; and (3) enforcement of the clause will not violate public policy." Union Pacific R.R. Co. v. United States ex rel. U.S. Army Corps of Engineers, 591 F.3d 1311, 1321 (10th Cir. 2010)(emphasis omitted)(quoting Schmidt v. United States, 912 P.2d 871, 874 (Okla. 1996)). At all times in this litigation, the parties and the Court have focused on the second requirement.[2]

To confirm that no vast difference in the bargaining power of the parties existed at the time of the agreement, an Oklahoma court will consider "(1) the importance of the subject matter to the physical or economic well-being of the party agreeing to the release and (2) the amount of free choice that party could have

---

[2] To be clear, the Court finds that the other requirements are easily satisfied here. The language of the contract clearly and unambiguously exonerates JAM with respect to the breach of contract claim; the intent to relieve JAM and the nature and extent of the damages JAM sought to avoid are clear. See Manning v. Brannon, 956 P.2d 156, 158-59 (Okla. Civ. App. 1997). Additionally, the Court finds that the clause at issue is not contrary to Oklahoma's public policy because, if enforced, it would neither "tend to injure public morals, public health or confidence in the administration of the law" nor "destroy the security of individuals' rights to personal safety or private property." Schmidt v. United States, 912 P.2d 871, 875 (Okla. 1996)(providing the two classes of exculpatory agreements that "may be said to violate public policy").

exercised when seeking alternate services." Schmidt, 912 P.2d at 875. At no time has Ole Brook asserted that it was somehow forced to contract with JAM. Thus, the second element is met, and the Court will focus on the first. See Manning v. Brannon, 956 P.2d 156, 159 (Okla. Civ. App. 1997).

The Court concludes that Ole Brook has failed to raise a genuine dispute of fact as to whether the Well project was necessary or important to its physical or economic well-being. JAM has at all times asserted that the entities were substantially similar in bargaining power at the time they entered the contract. Ole Brook defeated JAM's previous *Motion for Summary Judgment* (Rec. Doc. 107) with an affidavit from Mr. Jones stating that the Well project was of vital importance to Ole Brook. The results of the additional discovery that this Court permitted on this issue reveal that Ole Brook was possessed of more assets than JAM at the time of contracting and that the company's revenues in 2011 totaled approximately $3 million. The additional discovery also confirmed that both companies are small limited liability companies with three or fewer members. Lastly, the additional discovery reveals that JAM allowed Ole Brook an opportunity to review the MSA and suggest changes. Mr. Jones's sense that the contract was offered on a "take it or leave it" basis because such contracts sometimes are in the oil and gas business does not constitute evidence that

12

JAM actually offered its contract on a take it or leave it basis in this case. The Court concludes that there was no *vast difference* in JAM's and Ole Brook's bargaining power at the time the parties entered the MSA. Accordingly, the Court will enforce the exculpatory provision in the MSA, and Ole Brook is precluded from asserting a breach of contract claim herein.

**B. JAM's Obligations Under the MSA**

JAM also argues that it is entitled to summary judgment because the MSA does not create any obligations on the part of JAM that could give rise to a breach of contract claim separate from that asserted in the state court proceeding. Having previously concluded that the exculpatory provision is enforceable and, thus, that Ole Brook is precluded from asserting its breach of contract claim, the Court need not address this argument.

Accordingly,

**IT IS HEREBY ORDERED** that JAM's *Motion for Summary Judgment* **(Rec. Doc. 152)** is **GRANTED**.

New Orleans, Louisiana this 27th day of February, 2015.

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE