UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

SOLSTICE OIL & GAS I LLC                    CIVIL ACTION

VERSUS                                      NO: 12-2417

OBES INC. ET AL.                            SECTION: "J" (5)

## ORDER & REASONS

Before the Court is Defendant Seneca Insurance Company (Seneca)'s *Motion for Summary Judgment* **(Rec. Doc. 159);** oppositions thereto filed by Plaintiff Solstice Oil & Gas I LLC (Solstice) (Rec. Doc. 194) and Third-Party Plaintiff OBES, Inc. (Ole Brook) (Rec. Doc. 195); Seneca's reply (Rec. Doc. 202); and Ole Brook's supplemental memorandum in opposition. (Rec. Doc. 207) Also before the Court is Defendant Commerce & Industry Insurance Company (C&I)'s *Motion for Summary Judgment* **(Rec. Doc. 156)**, oppositions thereto filed by Solstice (Rec. Doc. 179) and Ole Brook (Rec. Doc. 173), C&I's reply (Rec. Doc. 190), and Seneca's reply to Solstice's and Ole Brook's oppositions. (Rec. Doc. 189) Having considered the parties' submissions, the record, and the applicable law, the Court finds, for the reasons expressed below, that the motions should be **GRANTED**.

## FACTS AND PROCEDURAL BACKGROUND

This action arises out of the drilling of the ML Mann et al. No. 1 Well in West Avondale Field, St. Charles Parish, Louisiana. On August 15, 2011, JAM Petroleum, LLC (JAM) and

Solstice entered into a Joint Operating Agreement (JOA) regarding the establishment of oil and gas leases. The JOA provides that JAM is the Operator of leases formed under the agreement, and Solstice is a non-operating interest-holder.

In its role as Operator, JAM contracted with more than eight drilling and servicing companies to drill the Well, including Ole Brook for its directional drilling services. As directional driller, Ole Brook was charged with directing the drilling of the nonvertical wellbore to a predetermined underground target using down hole drilling equipment, including Measurement-While-Drilling (MWD) tools. (Rec. Doc. 159-2, p. 4) The MWD tools allow directional drillers, such as Ole Brook, to plot the course of the drilling and give the driller navigational instructions. Id. Under the terms of JAM's Master Services Agreement (MSA) with Ole Brook, Ole Brook "warrant[ed] that it [was] an expert in its field [of directional drilling]; that all work [would] be performed safely and in a good and workmanlike manner; that [Ole Brook] ha[d] adequate equipment in good working order and fully trained personnel capable of efficiently and safely operating such equipment and performing services." Id. at 3 (emphasis omitted).

JAM hired Nabors Drilling USA, LP (Nabors) to provide the drilling platform and to perform the initial vertical drilling operations. Id. at 3. Accordingly, Nabors drilled the vertical

wellbore to roughly 3600 feet. Id. at 5. On or about November 14, 2011, Ole Brook began directionally drilling the Well from approximately 3600 feet. Id.; (Rec. Doc. 195-1, p. 2). Ole Brook continued to directionally drill the Well, in part with the assistance of its subcontractor PinPoint Drilling and Directional Services, LLC, through late December of 2011. Id. Ole Brook was discharged from the project on December 27, 2011, after the parties experienced a number of problems drilling the Well. Id.; (Rec. Doc. 195-1, p. 2).

Thereafter, JAM determined that the Well was "damaged" and had deviated drastically from the target bottom hole location, which prevented JAM from using the Well to test the prospect that it was designed to test. (Rec. Doc. 1; Rec. Doc. 30, p. 2; Rec. Doc. 159-2, p. 6) This deviation and failure necessitated the drilling of a second, side-track well to test the prospect. (Rec. Doc. 159-2, p. 6) Alternative directional drillers completed the second well, which successfully reached the target location but resulted in a dry hole. Id.

On October 1, 2012, Solstice filed suit against Ole Brook and its insurers, Seneca and C&I.[1] (Rec. Doc. 1) Solstice alleges that Ole Brook did not drill the Well according to specifications, resulting in a misshaped Well and causing "physical injury to the Well and to the integrity of the

---

[1] Solstice did not file suit against any of the other contractors who assisted in drilling the Well.

wellbore." Id.; (Rec. Doc. 30, p. 2). Consequently, Solstice claims Ole Brook breached its obligations under the MSA, industry standards, and the standard of performance warranted in the MSA. (Rec. Doc. 1) Solstice brought claims against the insurers under the Louisiana Direct Action Statute, Louisiana Revised Statute Section 22:655. Id. Ole Brook denied the allegations in the complaint and filed counterclaims against Solstice, crossclaims against Seneca and C&I, and third-party complaints against other contractors who were engaged in drilling the Well. (Rec. Doc. 31)

On January 27, 2015, C&I filed its *Motion for Summary Judgment*. **(Rec. Doc. 156)** Ole Brook opposed the motion on February 6, 2015 (Rec. Doc. 173), and Solstice filed its opposition on February 10, 2015. (Rec. Doc. 179) C&I replied on February 11, 2015. (Rec. Doc. 190) That same day, Seneca filed a reply to Solstice's and Ole Brook's oppositions to C&I's motion. (Rec. Doc. 189)

Likewise, on January 28, 2015, Seneca filed its *Motion for Summary Judgment*. **(Rec. Doc. 159)** Solstice (Rec. Doc. 194) and Ole Brook (Rec. Doc. 195) opposed the motion on February 16, 2015. Seneca replied on February 25, 2015. (Rec. Doc. 202) OBES filed a supplemental memorandum in opposition to the *Motion for Summary Judgment* on March 4, 2015. (Rec. Doc. 207)

## **PARTIES' ARGUMENTS**

### **A. Insurers' Motions**

Seneca and C&I (collectively, "insurers") argue that they are entitled to summary judgment on Solstice's claims and Ole Brook's crossclaims because their contracts of insurance with Ole Brook do not cover the damages allegedly suffered by Solstice, and even if they did, such damages are excluded from coverage under the policies' exclusions. (Rec. Doc. 159-2; Rec. Doc. 156-1) To begin, C&I argues that Louisiana's choice of law analysis dictates that Texas law applies to the interpretation of the insurance contract. (Rec. Doc. 156-1, pp. 8-9) Seneca asserts, however, that "it is not necessary to determine whether Louisiana law or Texas law applies to the coverage issues presented by th[e] Motion for Summary Judgment," because Louisiana and Texas law are identical in their interpretation of the insurance contract. (Rec. Doc. 159-2, p. 7)

Insurers argue that their contracts of insurance with Ole Brook do not cover the claimed damages, because Solstice has not made a claim for property damage as it is defined in the policies. Both policies define "property damage" as:

a. Physical injury to tangible property, including all resulting loss of use of that property. . . .; or

b. Loss of use of tangible property that is not physically injured. . . .

5

(Rec. Doc. 159-2, p. 8; Rec. Doc. 156-1, p. 15) Insurers argue that Solstice has alleged only "economic damages" from Ole Brook's alleged breach of contract. (Rec. Doc. 159-2, pp. 13-15; Rec. Doc. 156-1, pp. 10-12) According to insurers, the U.S. Court of Appeals for the Fifth Circuit has previously held that the cost associated with drilling a well in the wrong place constitutes economic, rather than property, damage. (Rec. Doc. 159-2, p. 14; Rec. Doc. 156-1, pp. 11-12)(citing PPI Tech. Servs, LP v. Liberty Mut. Ins. Co., 515 Fed. App'x 310 (5th Cir. 2013)). Here, Solstice complains that the Well was improperly drilled, necessitating the drilling of a second well. (Rec. Doc. 159-2, p. 14; Rec. Doc. 156-1, p. 12) Solstice does not complain of damage to the Well, but rather that the Well did not reach the intended target location. (Rec. Doc. 159-2, p. 14; Rec. Doc. 156-1, p. 12) Thus, insurers contend that Solstice has not alleged any property damage covered under the policy.

Moreover, each insurer argues that it is not liable for the claimed damages under its respective oil industry-related endorsement. First, Seneca argues that it is not liable under its policy's underground resources and equipment endorsement, because Solstice has not provided any evidence to show that it experienced property damage pursuant to that provision. Id. at 17-20. Seneca's policy provides coverage for property damage to any of the following:

a. Oil, gas, water or other mineral substances which have not been reduced to physical possession above the surface of the earth or above the surface of any body of water;

b. Any well, hole, formation, strata or area in or through which exploration for or production of any substance is carried on;

c. Any casing, pipe, bit, tool, pump or other drilling or well servicing machinery or equipment located beneath the surface of the earth in any such well or hole or beneath the surface of any body of water.

Id. at 11-12. Seneca argues that Solstice has not produced a witness who can testify that it suffered physical damage to its Well or any of its equipment covered by the underground resources and equipment provision. Id. Thus, Seneca asserts that it is not liable under its contract of insurance with Ole Brook for any damage to underground resources and equipment.

Next, C&I argues that it is not liable under its Oil Industries Endorsement because it precludes recovery for Solstice's alleged damages to certain equipment. (Rec. Doc. 156-1, pp. 18-19) The applicable part of C&I's Oil Industries Endorsement excludes the following from coverage:

1. Loss of hole and any in-hole equipment, including fishing costs; . . .

4. loss or damage to drilling rigs, drilling or production platforms, work-over rigs, servicing rigs or any equipment or machinery above the surface of the earth or above the sub-sea well head of any body of water which is in the insured's care, custody and control;

5. damage to any casing, pipe, bit, tool, pump or other drilling or well servicing machinery or equipment located beneath the surface of the earth in any well or hole;

6. removal of wreck and debris[.]

(Rec. Doc. 156-1, pp. 18-19; Rec. Doc. 156-3, p. 58) Therefore, "Solstice's claim for damages to casing, drill pipe, and drill bits and tools 'stuck in hole' is specifically excluded from coverage" by the exclusion, and C&I is not liable under its contract of insurance. (Rec. Doc. 156-1, p. 19)

**B. Solstice's and Ole Brook's Oppositions**

Solstice and Ole Brook (collectively, "nonmovants") argue that genuine issues of material fact preclude summary judgment here.[2] (Rec. Docs. 194, 195) First, Solstice agrees with Seneca's contention that it is not necessary to determine whether Louisiana or Texas law applies to the interpretation of the insurance contract, because the issue is not outcome determinative. (Rec. Doc. 194, p. 7) Although Ole Brook mentions that the choice of law determination may create a factual dispute inappropriate for summary judgment, Ole Brook similarly employs the laws of both jurisdictions. (Rec. Doc. 195, p. 3) Nonmovants also assert that, although they bear the initial burden of establishing coverage under the policy, insurers then bear the burden of showing the applicability of any exclusion.

---

[2] The Court will summarize the nonmovants' arguments together because they are generally the same and will cite to Solstice's opposition unless Ole Brook presents a different argument.

(Rec. Doc. 194, p. 8) Thus, nonmovants argue that summary judgment is inappropriate unless "there is no reasonable interpretation of the policy, when applied to the undisputed material facts shown by the evidence supporting the motion, under which coverage could be afforded." Id. at 8-9 (quoting Reynolds v. Select Props., Ltd., 634 So. 2d 1180 (La. 1994)).

Next, nonmovants assert that Solstice has alleged and provided evidence to show "that the Well was so damaged that Solstice had to drill a sidetrack well to test the target zones," which damage constitutes property damage as defined under the policies. Id. at 9. First, Solstice asserts that there is evidence of physical injury to the Well. Id. at 10-12. Solstice points to surveys revealing that the Well's path rendered it a "compromised wellbore with unnecessary twists and turns making it inadequate for efficient completion and production." Id. at 11. Solstice further relies on testimony from its expert petroleum engineer and JAM's onsite representative to show that the Well was damaged and, consequently, had to be abandoned. Id. Ole Brook references deposition testimony from JAM's company man stating that the formation and wellbore were damaged by being left open to drilling fluids because of Ole Brook's alleged faulty drilling. (Rec. Doc. 195, pp. 13-14) Second, nonmovants dispute insurers' claim that Solstice seeks only uncovered economic damages. (Rec.

Doc. 194, pp. 12-14) In fact, nonmovants assert that Solstice
has alleged and seeks damages for actual physical damage to the
Well. Id. at 13. Third, nonmovants dispute insurers' assertion
that Solstice failed to set forth a loss of use claim. Id. at
14. Insurers seem to argue that, because the second well
resulted in a dry hole, Solstice cannot make a loss of use
claim. Id. However, when the first Well became so damaged that
it had to be abandoned, Solstice was not able to use the first
Well for its intended purpose of testing the desired formation.
Id. Solstice therefore argues that it lost the use of the Well.
Id.

    Nonmovants also argue that insurers have not shown that
their policy exclusions deny coverage in this case. Id. at 15-
25. First, nonmovants argue that Seneca's underground resources
and equipment coverage endorsement, which limits the reach of
certain exclusions, clearly applies here. Id. at 15-16. The
endorsement covers damage to the Well, which, as discussed
above, Solstice argues occurred in this case. Id. Second,
nonmovants dispute the applicability of C&I's Oil Industries
Endorsement because, as an excess "follow form" policy, C&I's
policy of insurance provides that its coverage follows that of
the primary insurer, Seneca. (Rec. Doc. 179, pp. 13-14)
Nonmovants argue that Seneca's underground resources and
equipment coverage is incorporated into C&I's policy. Id. at 22-

23. Thus, the Oil Industries Endorsement is inapplicable because it conflicts with Seneca's coverage for underground resources and equipment. Id. at 32-33. Additionally, even if the Oil Industries Endorsement applied, under its express language it would not preclude coverage for loss of—as opposed to damage to— underground machinery or equipment. Id. at 33. Consequently, nonmovants argue that insurers' policies afford coverage for Solstice's damages, and the Court must deny insurers' motions for summary judgment.

## C. Insurers' Replies

Insurers dispute Solstice's allegations of property damage. (Rec. Doc. 202; Rec. Doc. 190) Insurers insist Solstice's purported evidence of property damage actually supports their position that Solstice seeks only economic damages. (Rec. Doc. 202, pp. 1-3; Rec. Doc. 190, pp. 1-5) That is, the evidence shows that Solstice's damages arise from the Well's deviation from the targeted bottom hole location rather than from any physical damage to the Well. (Rec. Doc. 202, p. 2; Rec. Doc. 190, p. 3) Insurers further argue that their policy exclusions preclude coverage here. (Rec. Docs. 202, 190) In particular, C&I argues that the Oil Industries Endorsement precludes coverage here even though its policy is a "follow form" policy. (Rec. Doc. 190, pp. 5-7, 9-10) C&I stresses that its policy follows the form of Seneca's policy "*subject to . . . all other terms,*

11

*definitions, conditions and exclusions of [the C&I Policy]*." Id. at 5. Additionally, C&I argues that nonmovants have not shown what equipment was damaged or lost, and consequently, they cannot show that the C&I policy provides coverage for any damage to underground equipment. Id. at 9-10.

## LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If that burden has been met, the nonmoving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986).

## DISCUSSION

"A summary judgment may be rendered on the issue of insurance coverage alone, although a genuine issue as to liability or the amount of damages exists," but only if "no reasonable interpretation of the policy, when applied to the undisputed material facts shown by the evidence supporting the motion, exists under which coverage could be afforded." Stewart Interior Contractors, L.L.C. v. MetalPro Indus., L.L.C., 2007-0251, pp. 5-6 (La. App. 4 Cir. 10/10/07), 969 So. 2d 653, 658

(citing Reynolds v. Select Props., Ltd., 93-1480 (La. 4/11/94), 634 So. 2d 1180, 1183; Leflore v. Coburn, 95-0690 (La. App. 4 Cir. 12/28/95), 665 So. 2d 1323). "[I]n an insurance contract dispute, the initial burden falls upon the insured[, or the plaintiff in a direct action,] to establish coverage under the terms of the policy." Comsys Info. Tech. Servs., Inc. v. Twin City Fire Ins. Co., 130 S.W.3d 181, 188 (Tex. App. 2003); see also Turner v. Ewing, 232 So. 2d 468, 471-72 (La. 1970)(announcing the same rule under Louisiana law). The burden then shifts to the insurer to show that an exclusion to the policy applies and precludes coverage. Stewart Interior Contractors, L.L.C., 969 So.2d at 658; Comsys Info. Tech. Servs., Inc., 130 S.W.3d at 193. If or when this occurs, the insured or the plaintiff in a direct action must show that an exception to the exclusion applies and affords coverage. See Doerr v. Mobil Oil Corp., 2000-0947, p. 5 (La. 12/19/00), 774 So. 2d 119, 124 (noting that a plaintiff must prove that its claim falls within the policy coverage); Comsys Info. Tech. Servs., Inc., 130 S.W.3d at 193.

## A.   Choice of Law

The Court has reviewed relevant Texas and Louisiana authorities and concludes that any distinctions between them are not outcome determinative. Consequently, the Court finds that it is unnecessary to determine which state's law applies. See

<u>Williams v. Chesapeake Operating, Inc.</u>, No. CIV.A. 10-1906, 2014
WL 2718713, at *4 (W.D. La. June 16, 2014)("If the governing law
of each jurisdiction [having an interest in the dispute] is
identical, or so similar that the same result would be reached
under either law, there is a 'false conflict' and, thus, no need
to determine which state's law applies."(citing <u>Arabie v. CITGO
Petroleum Corp.</u>, 2010-2605 (La. 3/13/12), 89 So. 3d 307, 327)).

**B.   Whether Solstice's Alleged Injury Constitutes "Property
     Damage"**

     Under their policies of insurance, Seneca and C&I must pay
those sums that Ole Brook becomes legally obligated to pay as
damages because of covered property damage.[3] (Rec. Doc. 159-3, p.
18; Rec. Doc. 156-1, p.11) The policies define "property damage"
as:

> a. Physical injury to tangible property, including all
>    resulting loss of use of that property. . . .; or
>
> b. Loss of use of tangible property that is not
>    physically injured. . . .

(Rec. Doc. 159-3, p. 32; Rec. Doc. 156-1, p. 11) Solstice
alleges that it suffered property damage as a result of Ole
Brook's deficient directional drilling services. Specifically,
Solstice states that Ole Brook "caused damage to property owned
by Solstice, including without limitation, physical injury to
the Well and to the integrity of the wellbore. . . . The

---

[3] The Court does not discuss those requirements for coverage that are not in
dispute here.

materials used to drill the Well were in some cases, physically damaged by Ole Brook's negligence . . . ." (Rec. Doc. 30) Solstice provides exhibits further describing the alleged property damage. Solstice asserts that the down hole surveys performed by its contractor show a well that deviated and exhibited "pronounced dogleg[s, or] crooked or worn places in the wellbore." (Rec. Doc. 194, p. 10) Next, JAM's onsite representative, Thomas Dirks, described a Well so compromised that it could not "run a normal survey . . . because of the doglegs and the crookedness of the hole." (Rec. Doc. 179-4, p. 109) Dirks testified that the survey reports revealed that the Well was "very irregular," or "contorted" with "doglegs and turns and twists that shouldn't have been there." Id. at 110, 118. Another JAM representative testified that the formation was "damaged" by being open to drilling fluids as a result of Ole Brook's alleged faulty work. (Rec. Doc. 195, p. 13) Lastly, Solstice's expert petroleum engineer, William D. Griffin, will testify that "the wellbore had become so compromised, problematic and zig-zagged as a result of Ole Brook's guidance of the Well that it could no longer be drilled to reach the target bottom hole location with any useful well bore." (Rec. Doc. 179-4, p. 49) Further, in his opinion, "the only portion of the wellbore that [was not] irreparably damaged during the drilling of the Well was that portion of the wellbore from the

surface to approximately 3,600' MD," which Ole Brook did not drill. Id. at 50. Additionally, Solstice asserts that it suffered loss of use of tangible property because it was not able to use the Well that Ole Brook drilled for its intended purpose to test the formation. (Rec. Doc. 194, pp. 13-15)

Insurers argue that the above-summarized evidence merely shows that the Well did not reach its intended target location and does not support a finding of "property damage" under the policies. In doing so, insurers rely on PPI Technology Services, L.P. v. Liberty Mutual Insurance Co., 515 Fed. App'x 310 (5th Cir. 2013). In PPI, the U.S. Court of Appeals for the Fifth Circuit held that a commercial general liability insurance provider had no duty to defend where the complaint lodged against the insured made only legal conclusions of property damage or alleged only economic damages. Id. at 314. Plaintiffs, owners of oil and gas leases, hired the insured, PPI, "to assist in well-planning and oversee the drilling of wells on the leases." Id. at 312. The resulting well "was dug on the wrong lease, plugged, and abandoned." Id. Plaintiffs then filed suit against PPI. Id. Plaintiffs alleged that PPI negligently "caused the drilling rig to be towed to [ ] and placed upon [ ] the wrong location." Id. This caused the well to be drilled in the wrong location, resulting in a dry hole. Id. Plaintiffs further alleged "'property damage to [Plaintiff] as an owner in the

property where the well was being drilled' including 'physical injury to tangible property, including all resulting loss of use of the property.'" Id. Plaintiffs sought damages for the cost of drilling the well in the wrong location and delay rentals to maintain the lease for where the well was meant to be drilled. Id. The Fifth Circuit held, however, that the underlying complaints "did not allege facts supporting actual damage to or loss of tangible property." Id. at 314. Rather, the allegations purporting to show property damage were either legal conclusions, which were insufficient to implicate the insurer's duty to defend, or for economic damages and therefore not covered by the policy. Id.

The Court further finds Mid-Continent Casualty Co. v. Camaley Energy Co., Inc., 364 F. Supp. 2d 600 (N.D. Tex. 2005) to be instructive. In Camaley, the U.S. District Court for the Northern District of Texas found that a claimant in an underlying lawsuit had alleged property damage for loss of use sufficient to implicate the insurer's duty to defend. Id. at 606. Plaintiffs in the underlying lawsuit had engaged Camaley, the insured, to drill a well. Id. at 602. Plaintiffs alleged that Camaley's negligence in carrying out its obligations resulted in the well being drilled on the wrong, neighboring leasehold, which caused "constructive eviction of [a plaintiff] from its leasehold and use of enjoyment of same." Id.; id. at

605. The court noted that such allegations "clearly [did] not allege physical injury to tangible property," but found that it satisfied the "loss of use" prong of the policy's "property damage" definition. Id. at 605-06. Specifically, the court found that the plaintiffs' allegation of constructive eviction from the leasehold on its face seemed to constitute loss of use and, therefore, property damage. Id. at 606. Ultimately, however, because the court also found that policy exclusions applied and precluded coverage for all of the plaintiffs' alleged injuries, the court held that the insurer had neither a duty to defend nor a duty to indemnify. Id. at 609.

Although the courts in PPI and Camaley largely addressed the issue of whether the insurer had a duty to defend, the Court finds the cases to be instructive here in analyzing whether the insurers have a duty to indemnify. When the Fifth Circuit in PPI held that the plaintiffs in the underlying suit had not made factual allegations of property damage, the Fifth Circuit necessarily found that the plaintiffs' allegations that (1) PPI caused the well to be drilled in the wrong place, and (2) that the alleged property damage arising from such activity injured plaintiffs as owner in the property where the well was incorrectly drilled did not constitute allegations of property damage. See PPI, 515 Fed. App'x at 312, 314. As such, it follows that evidence showing the same, considered alone, would be

18

insufficient to implicate the insurer's duty to indemnify. Compare id. at 313 (noting that an insurer's duty to defend "is determined solely on the facts alleged in the underlying lawsuit and the terms of the policy"), and Maldonado v. Kiewit La. Co., 2013-0756, pp. 11-12 (La. App. 1 Cir. 3/24/14), 146 So. 3d 210, 218-19 (same under Louisiana law), with Gehan Homes, Ltd. v. Emp'rs Mut. Cas. Co., 146 S.W.3d 833, 842 n.6 (Tex. App. 2004)("[A] duty to indemnify is determined by the actual facts as proven."), and Martco Ltd. P'ship v. Wellons, Inc., 588 F.3d 864, 877 (5th Cir. 2009)(same under Louisiana law); see also Am. States Ins. Co. v. Bailey, 133 F.3d 363, 368 (5th Cir. 1998)("Under Texas law, the duty to defend is broader than the duty to indemnify."); Mossy Motors, Inc. v. Cameras Am., 2004-0726, p. 6 (La. App. 4 Cir. 3/2/05), 898 So. 2d 602, 606 ("Generally, an insurer's duty to defend lawsuits against its insured is broader than its liability for damage claims."). Likewise, in Camaley, the district court relied upon the underlying plaintiffs' allegation of constructive eviction from their leasehold—rather than the fact that the well had not been drilled in the right location and therefore failed to reach the targeted bottom hole location—in finding that they had alleged loss of use and, therefore, property damage under the policy. 364 F. Supp. 2d at 605-06. Thus, the Court concludes that an insured's failure to drill a well to its targeted bottom hole

location alone does not constitute property damage under either the "physical injury to tangible property" or "loss of use" prong of the definition. See PPI, 515 Fed. App'x at 314; Camaley, 364 F. Supp. 2d at 605.

The Court first addresses Solstice's allegations of physical injury to tangible property, i.e. the well or wellbore beyond 3600 feet. Solstice argues that it has produced evidence showing physical injury to tangible property beyond Ole Brook's failure to reach the targeted bottom hole location. As summarized above, nonmovants point to down hole surveys, JAM representatives' deposition testimony, and the opinion of its expert petroleum engineer, William D. Griffin, in support. (Rec. Doc. 194, pp. 10–11; Rec. Doc. 195, p. 13) They argue that "the crookedness of the hole and its uselessness" and the fact that "it was a compromised wellbore with unnecessary twists and turns making it inadequate for efficient completion and production" constitute property damage separate and apart from the Well's deviation from the target hole location. (Rec. Doc. 194, pp. 10–11) But William Griffin, Solstice's own expert, describes these problems with the wellbore in terms of the inability to reach the bottom hole location, stating that "the wellbore [was] so compromised, problematic and zig-zagged as a result of Ole Brook's guidance of the Well that it could no longer be drilled to reach the target bottom hole location with any useful well

bore." (Rec. Doc. 179-4, p. 49) He goes on to list the reasons why a particularly crooked wellbore is problematic:

> 1) the wellbore is not located in the planned path; 2) the casing string may no longer properly fit through the deviated section; 3) repeated rubbing by the drillstring in a particular part of the dogleg creates a worn spot called a "keyseat", in which the components may become stuck as they are pulled through the section; and 4) excessive doglegs increase the overall friction to the drillstring, making it easier to get stuck or not reach the planned total depth.

Id. at 50. Each of these reasons merely shows that the crooked wellbore is problematic because it either deviates from the planned path or prevents the well from reaching its targeted bottom hole location. The same can be said for nonmovants' purported additional evidence of "property damage." Such facts or circumstances are akin to a failure to reach the targeted bottom hole location, which does not constitute physical injury to tangible property under PPI. See 515 Fed. App'x at 314.

Further, to the extent that Solstice, as interest holder in the applicable oil and gas lease, complains generally of damage to the land over which it holds the lease as a result of the "compromised, problematic and zig-zagged" wellbore, the Court finds that such claim is foreclosed by PPI. See (Rec. Doc. 107-1, p. 2; Rec. Doc. 179-4, p. 49). In PPI, the underlying plaintiffs alleged both the fact of their interest in the land through which the insured drilled the well and the fact that the insured erroneously drilled the well in the wrong place on this

21

land. 515 Fed. App'x at 312. The Fifth Circuit necessarily found that these factual allegations did not constitute physical injury to tangible property (i.e., property damage) under the policy when it held that the underling plaintiffs' allegations of property damage were merely legal conclusions or sought economic damages. See id. at 314. Similarly, here, that Solstice held an interest in the oil and gas lease over the land through which Ole Brook drilled a well that failed to reach the targeted bottom hole location does not constitute physical injury to tangible property. If the aforementioned factual allegations in PPI were insufficient to implicate the insurer's duty to defend, then Solstice's evidence proving the same should not implicate its insurer's duty to indemnify in this case. See Am. States Ins. Co., 133 F.3d at 368 ("Under Texas law, the duty to defend is broader than the duty to indemnify."); Mossy Motors, Inc., 2004-0726, p. 6, 898 So. 2d at 606 ("Generally, an insurer's duty to defend lawsuits against its insured is broader than its liability for damage claims.").

The Court notes that the cases that nonmovants cite to the contrary—that is, to show that Solstice's losses are covered under the policy—are distinguishable. See (Rec. Doc. 194, p. 9; Rec. Doc. 195, pp. 7-8)(citing Hollybrook Cottonseed Processing, L.L.C. v. Am. Guarantee & Liab. Ins. Co., 772 F.3d 1031 (5th Cir. 2014); Stewart Interior Contractors, L.L.C. v. MetalPro

Indus., L.L.C., 2007-0251 (La. App. 4 Cir. 10/10/07), 969 So. 2d 653); Petrol Indus., Inc. v. Gearhart-Owen Indus., Inc., 424 So. 2d 1059 (La. App. 2 Cir. 1982)). First, in Hollybrook, the Fifth Circuit held that the insurer had failed to show that an exclusion precluded coverage for damages resulting from loss of use of an entire plant as a result of the insured's faulty equipment. 772 F.3d at 1035. Second, in Stewart, the Louisiana Court of Appeal for the Fourth Circuit held that claims for redhibition or breach of contract were not per se claims for "economic damages" that can never constitute "property damage" or an "occurrence" under a commercial general liability insurance policy. 2007-0251, p. 12, 969 So. 2d at 661-62. Moreover, the Court goes on to state that the underlying plaintiff triggered coverage under the policy by alleging that there had been damage to property other than the equipment that the insured itself manufactured. Id. If anything, this supports the Court's position, although the Court notes that the court in Stewart could be conflating the property damage analysis with the analysis of the policy exclusions. Lastly, in Petrol, the underlying plaintiff, owner of an oil well, contracted with the insured to patch a hole in its well's casing. 424 So. 2d at 1060-61. When the insured activated the patching tool after running it into the well bore, an explosion occurred. Id. at 1061. As a result of the explosion, the patching tool was lost,

and the casing and well were so damaged that the well was plugged and abandoned. Id. The Louisiana Court of Appeal for the Second Circuit held that the exclusion precluding coverage for damage to property under the care and custody of the insured did not apply when the entire well, and not merely the casing, was damaged by the insured, even if the insured had "care and custody" over the casing at the time of the accident. Id. at 1064. None of the above-described relevant holdings from the opinions cited by nonmovants persuade the Court that the losses about which Solstice complains, and which the record reflects, constitute physical injury to tangible property.

The Court next addresses Solstice's allegations of loss of use of the well or wellbore.[4] Solstice argues that its inability to use the well that Ole Brook drilled for the intended purpose of testing the formation constitutes loss of use and, therefore, property damages under the policy. (Rec. Doc. 194, pp. 14-15) If that were the case, however, then the facts and allegations showing that the insured in Camaley caused the underlying plaintiff's well to be drilled in the wrong location—considered alone—would have supported a loss of use claim. Instead, it was the underlying plaintiff's constructive eviction from its

---

[4] The Court notes that "loss of use" of either physically injured tangible property or tangible property that is not physically injured constitutes property damage under the policy. (Rec. Doc. 159-3, p. 32) Having previously concluded that the facts herein do not show physical injury to tangible property, the Court here examines whether Solstice has shown loss of use of tangible property that was not physically injured.

leasehold that gave rise to its loss of use claim. 364 F. Supp. 2d at 605-06. Unlike in Camaley, Solstice has not alleged or shown that it lost the use of its oil and gas lease as a result of Ole Brook's actions. Furthermore, it is difficult to understand how Solstice's inability to enjoy the use of a well not yet in existence could constitute loss of use of tangible property. See Cook v. Admiral Ins. Co., No. 2:09-CV-0109-J, 2010 WL 2605256, at *3 (N.D. Tex. June 29, 2010) ("The policy defines property damage as loss of use of 'tangible property.' Language used in insurance policies is ordinarily given its usual and popular meaning. 'Tangible property' is commonly understood to be property that is capable of being handled or touched. Here, a well completed at the specified depth is not 'tangible property' simply because it did not exist at the time of the alleged breach."(internal citations omitted)) aff'd on other grounds, 438 Fed. App'x 313 (5th Cir. 2011); cf. Hollybrook, 772 F.3d at 1033, 1035 (affirming a loss of use claim when repeated breakdowns of the insured's faulty cotton processing equipment caused an entire cotton mill to experience "significant downtime" and robbed the plaintiff of the use of equipment not manufactured by the insured that was downstream of the insured's faulty equipment). The Court finds that Solstice's inability to use the well that Ole Brook drilled does not constitute property damage under the "loss of use" prong of the definition.

Lastly, the Court addresses the alleged property damage to the materials and tools used to drill the Well. See (Rec. Doc. 30). In its motion, Seneca explains that it undertook the defense of its insured, Ole Brook, pursuant to a reservation of rights, as a result of Solstice's allegations of damaged underground resources and equipment. (Rec. Doc. 159-2, p. 18) Seneca argues, however, "that in the course of written discovery and numerous depositions, Solstice has not come forward with a single piece of evidence of any damage to property included in the 'underground resources and equipment hazard.'" Id. Seneca further argues that, even if such damage existed, none of the property belonged to Solstice. Id. C&I repeats many of these same arguments. (Rec. Doc. 156-1, p. 18) In opposition, nonmovants argue that Ole Brook damaged the Well or wellbore because its drilling services resulted in a "compromised" wellbore, but they do not address any alleged damage to other equipment. (Rec. Docs. 194, 195) For example, they do not argue that Ole Brook damaged the Well or wellbore above 3600 feet.[5] Nor do they call attention to evidence of damage to underground resources or equipment belonging to Solstice other than the Well

---

[5] In fact, Ole Brook provides a quotation from Solstice's expert petroleum engineer suggesting that this portion of the Well was not damaged: "There were portions of the wellbore that one could say is not damaged, like shallower than 3600 feet." (Rec. Doc. 195, p. 13) Additionally, that same expert's affidavit, which Solstice submitted, states, "the only portion of the wellbore that had not been irreparably damaged during the drilling of the Well was that portion of the wellbore from the surface to approximately 3,600' MD." (Rec. Doc. 179-4, p. 50)

or wellbore, although they repeat allegations of such damage. The Court notes that nonmovants bear the burden of establishing coverage under the policy. <u>See</u> <u>Turner</u>, 232 So. 2d at 471-72; <u>Comsys Info. Tech. Servs., Inc.</u>, 130 S.W.3d at 188. Thus, as to insurers' arguments regarding a lack of property damage to underground resources or equipment other than the Well or wellbore on which Ole Brook worked, nonmovants have failed to meet their burden of raising a genuine issue of material fact. <u>Celotex</u>, 477 U.S. at 325 (noting that the nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial).

Accordingly,

**IT IS HEREBY ORDERED** that the insurers' *Motions for Summary Judgment* **(Rec. Docs. 159 & 156)** are **GRANTED**.

New Orleans, Louisiana this 12th day of May, 2015.

_____
CARL J. BARBIER
UNITED STATES DISTRICT JUDGE