UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

SOLSTICE OIL & GAS I LLC             CIVIL ACTION

VERSUS             NO: 12-2417

OBES INC. ET AL.             SECTION: "J"(5)

### ORDER & REASONS

Before the Court is a *Daubert Motion to Exclude George J. Panzeca* (**Rec. Doc. 227)** filed by Defendant OBES Inc. ("Ole Brook"), an opposition thereto (Rec. Doc. 234) filed by Plaintiff, Solstice Oil & Gas I LLC ("Solstice"), and a reply (Rec. Doc. 242) filed by Ole Brook. Also before the Court is Ole Brook's *Daubert Motion to Limit Testimony of William D. Griffin* **(Rec. Doc. 228)**, an opposition thereto (Rec. Doc. 235) filed by Solstice, and a reply (Rec. Doc. 244) filed by Ole Brook. Lastly, before the Court is Ole Brook's *Motion for Partial Summary Judgment* **(Rec. Doc. 229)**, an opposition thereto (Rec. Doc. 233) filed by Solstice, and a reply (Rec. Doc. 240) filed by Ole Brook. Having considered the motions and legal memoranda, the record, and the applicable law, the Court finds that all three motions should be **DENIED**.

**FACTS AND PROCEDURAL BACKGROUND**

This action arises out of the drilling of the ML Mann et al. No. 1 Well ("Well No. 1") in West Avondale Field, St. Charles Parish, Louisiana. On August 15, 2011, JAM Petroleum, LLC ("JAM") and Solstice entered into a Joint Operating Agreement ("JOA") regarding the establishment of oil and gas leases. The JOA provides that JAM is the Operator of leases formed under the agreement, and Solstice is a non-operating interest-holder.

In its role as Operator, JAM contracted with more than eight drilling and servicing companies to drill Well No. 1, including Ole Brook for its directional drilling services. As directional driller, Ole Brook was charged with directing the drilling of the nonvertical wellbore to a predetermined underground target using down hole drilling equipment, including Measurement-While-Drilling ("MWD") tools. (Rec. Doc. 159-2, at 4) The MWD tools allow directional drillers, such as Ole Brook, to plot the course of the drilling and give the driller navigational instructions. *Id.* Under the terms of JAM's Master Services Agreement ("MSA") with Ole Brook, Ole Brook "warrant[ed] that it [was] an expert in its field [of directional drilling]; that all work [would] be performed safely and in a good and workmanlike manner; that [Ole Brook] ha[d] adequate equipment in good working order and fully trained

2

personnel capable of efficiently and safely operating such equipment and performing services." *Id.* at 3 (emphasis omitted).

JAM hired Nabors Drilling USA, LP ("Nabors") to provide the drilling platform and to perform the initial vertical drilling operations. *Id.* Accordingly, Nabors drilled the vertical wellbore to roughly 3600 feet. *Id.* at 5. On or about November 14, 2011, Ole Brook began directionally drilling Well No. 1 from approximately 3600 feet. *Id.* Ole Brook continued to directionally drill the well, in part with the assistance of its subcontractor PinPoint Drilling and Directional Services, LLC, through late December of 2011. *Id.* Ole Brook was discharged from the project on December 27, 2011, after the parties experienced a number of problems drilling Well No. 1. *Id.*

Thereafter, JAM determined that Well No. 1 was "damaged" and had deviated drastically from the target bottom hole location, which prevented JAM from using the well to test the prospect that it was designed to test. (Rec. Doc. 1; Rec. Doc. 30, at 2) This deviation and failure necessitated the drilling of a second, side-track well to test the prospect, the ML Mann et al. No. 2 Well ("Well No. 2"). (Rec. Doc. 159-2, p. 6) Alternative directional drillers completed Well No. 2, which successfully reached the target location but resulted in a dry hole. *Id.*

3

On October 1, 2012, Solstice filed suit against Ole Brook and its insurers, Seneca and C&I.[1] (Rec. Doc. 1) Solstice alleges that Ole Brook did not drill Well No. 1 according to specifications, resulting in a misshaped well and causing "physical injury to the Well and to the integrity of the wellbore." *Id.* Consequently, Solstice claims Ole Brook breached its obligations under the MSA, industry standards, and the standard of performance warranted in the MSA. *Id.* Ole Brook denied the allegations in the complaint and filed counterclaims against Solstice, crossclaims against Seneca and C&I, and third-party complaints against other contractors who were engaged in drilling Well No. 1. (Rec. Doc. 31)

On August 11, 2015, Ole Brook filed the instant *Daubert Motion to Exclude George J. Panzeca* (**Rec. Doc. 227)**, *Daubert Motion to Limit Testimony of William D. Griffin* **(Rec. Doc. 228)**, and *Motion for Partial Summary Judgment* **(Rec. Doc. 229)**. Solstice opposed the motions on August 18, 2015. (Rec. Doc. 233; Rec. Doc. 234; Rec. Doc. 235) With leave granted from the Court, Ole Brook filed replies to Solstice's oppositions on August 25, 2015. (Rec. Doc. 240; Rec. Doc. 242; Rec. Doc. 244)

## LEGAL STANDARD

**A. Motions to Exclude or Limit Expert Testimony**

---

[1] Solstice did not file suit against any of the other contractors who assisted in drilling Well No. 1.

4

Federal Rule of Evidence 702 provides that a witness who is qualified as an expert may testify if: (1) the expert's "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (2) the expert's testimony "is based on sufficient facts or data"; (3) the expert's testimony "is the product of reliable principles and methods"; and (4) the principles and methods employed by the expert have been reliably applied to the facts of the case. Fed. R. Evid. 702. The United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), provides the analytical framework for determining whether expert testimony is admissible under Rule 702. Both scientific and nonscientific expert testimony are subject to the *Daubert* framework, which requires trial courts to make a preliminary assessment of "whether the expert testimony is both reliable and relevant." *Burleson v. Tex. Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). When expert testimony is challenged under *Daubert*, the party offering the expert's testimony bears the burden of proving its reliability and relevance by a preponderance of the evidence. *Moore v. Ashland Chem. Co.*, 151 F.3d 269, 276 (5th Cir. 1998).

The reliability of expert testimony "is determined by assessing whether the reasoning or methodology underlying the

5

testimony is scientifically valid." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007). A number of nonexclusive factors may be relevant to the reliability analysis, including: (1) whether the technique at issue has been tested, (2) whether the technique has been subjected to peer review and publication, (3) the potential error rate, (4) the existence and maintenance of standards controlling the technique's operation, and (5) whether the technique is generally accepted in the relevant scientific community. *Burleson*, 393 F.3d at 584. The reliability inquiry must remain flexible, however, as "not every *Daubert* factor will be applicable in every situation; and a court has discretion to consider other factors it deems relevant." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004); *see also Runnels v. Tex. Children's Hosp. Select Plan*, 167 F. App'x 377, 381 (5th Cir. 2006) ("[A] trial judge has considerable leeway in determining how to test an expert's reliability.") (internal quotation marks omitted).

**B.   Motion for Partial Summary Judgment**

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed.

R. Civ. P. 56(c)); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but a party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions. *Little*, 37 F.3d at 1075. A court ultimately must be satisfied that "a reasonable jury could not return a verdict for the nonmoving party." *Delta*, 530 F.3d at 399.

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263-64 (5th Cir. 1991) (citation omitted). The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party

7

must "'demonstrate the absence of a genuine issue of material fact,' but need not *negate* the elements of the nonmovant's case." *Little*, 37 F.3d at 1075 (quoting *Celotex*, 477 U.S. at 323). "If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response. If the movant does, however, meet this burden, the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Id.* The nonmovant's burden "is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Id.* (citations omitted) (internal quotation marks omitted).

## PARTIES' ARGUMENTS AND DISCUSSION

**A.    Motion to Exclude George J. Panzeca**

Ole Brook argues that George Panzeca, one of Solstice's proffered expert witnesses, should not be permitted to testify at the trial of this matter because his testimony will not help the jury understand the evidence or determine any fact in issue. (Rec. Doc. 227-1, at 4) Notwithstanding any qualifications that Panzeca may have, Ole Brook argues that his analysis in this case "is limited to adding together the amounts of invoices provided to him" and, importantly, he was not asked to express any opinion with respect to fault, causation, or damages. *Id.* at 1. In addition, Ole Brook argues that the probative value of

8

Panzeca "telling the jury how he added up the invoice amounts to get the total amount" is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, and needlessly presenting cumulative evidence. *Id.* at 8-9. According to Ole Brooke, Panzeca's testimony would amount to fact testimony presented under the guise of an expert opinion, which would have the tendency to confuse and mislead the jury as to the amount of damages to which Solstice is entitled. *Id.* at 1-2.

In opposition, Solstice refutes Ole Brook's arguments that Panzeca's testimony is irrelevant or otherwise inadmissible. Solstice argues that Panzeca's so-called "straightforward computation" was the result of "the application of accounting principles in verifying costs, auditing expenses by researching source documents, and making judgment calls on what expenses should be categorized as those incurred in drilling the wells at issue." (Rec. Doc. 234, at 1) Panzeca lists all costs he determined Solstice incurred in drilling the two wells in Exhibit B attached to his report. In short, Solstice concedes that Panzeca arrives at his final number by adding up all the expenses listed in Exhibit B; however, Solstice argues that "it is the step *before* the addition – the decision to include or exclude certain costs – that requires specialized knowledge and expertise." *Id.* at 4. Furthermore, Solstice argues that the

9

total costs of the two wells will assist the jury in determining the damages that should be awarded to Solstice. *Id.* at 4-5.

Solstice also argues that Panzeca's testimony has substantial probative value with no prejudicial effect on Ole Brook. According to Solstice, the jury needs reliable data and independent testimony concerning the total costs in order to make an informed decision as to damages. *Id.* at 6. Moreover, Solstice argues that Panzeca's testimony is necessary to avoid undue delay. "Without his testimony, the jury otherwise would be presented with hundreds if not thousands of pages of financial documents, with little guidance or means of synthesizing their contents." *Id.*

"Whether the situation is a proper one for the use of expert testimony is to be determined on the basis of assisting the trier." Fed. R. Evid. 702 advisory committee's note. This inquiry goes primarily to the issue of relevancy. *Daubert*, 509 U.S. at 591-92. Rule 401 of the Federal Rules of Evidence defines "relevant" evidence as that which has any tendency to make a fact of consequence in determining the action more or less probable than it would be without the evidence. Fed. R. Evid. 401. "Therefore, expert testimony is not relevant, and thus, inadmissible if it is not helpful." *Sudo Props., Inc. v. Terrebonne Parish Consol. Gov't*, No. 04-2559, 2008 WL 2623000, at *8 (E.D. La. July 2, 2008).

10

Under Rule 702, "an expert can be employed if his testimony will be helpful to the trier of fact in understanding evidence that is simply difficult, [though] not beyond ordinary understanding." *United States v. Downing*, 753 F.2d 1224, 1229 (3d Cir. 1985). Trial courts have broad discretion to decide "whether the jury could adeptly assess the situation using only their common experience and knowledge." *Peters v. Five Star Marine Serv.*, 898 F.2d 448, 450 (5th Cir. 1990) (per curiam).

Courts have taken a liberal approach to the admissibility of expert testimony in instances where a party offers expert guidance to the trier of fact regarding factual issues that arguably fall within the competence of lay people. For example, in *Sudo Properties, Inc. v. Terrebonne Parish Consolidated Government*, the defendant sought to exclude an accounting expert's testimony because his method consisted of "simple arithmetic." 2008 WL 2623000, at *7. The court rejected the defendant's argument and held that the accountant's testimony was admissible. *Id.* at *10. In reaching its conclusion, the court found that "[the accountant's] specialized knowledge, regardless of whether his calculations involve complex methodology, will assist the trier of fact." *Id.; see also Cromeans v. Morgan Keegan & Co.*, No. 12-04269, 2014 WL 5351193, at *1 (W.D. Mo. Oct. 20, 2014) ("Even if individual calculations are simple, an expert's ability to present calculations from

11

disparate sources in an understandable format can assist a jury and therefore be admissible, particularly in light of the liberal construction of [Rule] 702."); *Total Control, Inc. v. Danaher Corp.*, 338 F. Supp. 2d 566, 569 (E.D. Pa. 2004) (rejecting the argument that a financial analyst's testimony should be excluded because his damage calculations were based on simple arithmetic, and finding that the expert's "ability to present a vast quantity of calculations derived from disparate sources in an understandable format will assist the jury").

In the instant case, Ole Brook does not dispute that Panzeca is an expert in the field of accounting. Although Panzeca uses "facially inexpert methods (i.e., simple addition and subtraction)" to calculate the total costs incurred to drill the wells, it is his specialized knowledge of oil and gas accounting procedures that will assist the trier of fact in this case. *See Sudo Props.*, 2008 WL 2623000, at *9. Panzeca applied his specialized knowledge as an accountant to review and analyze "hundreds of invoices, copies of checks, general ledger expense items and bank statements" to identify the costs incurred by Solstice to drill the wells. (Rec. Doc. 234-4, at 1) Relying on his experience in accounting, Panzeca audited and verified the expenses incurred and determined which expenses should be included as direct costs to drill the wells and which expenses should be excluded. *Id.* Regardless of whether Panzeca's

calculations involve complex methodology, his ability to present a vast quantity of calculations derived from disparate sources in an understandable format will assist the trier of fact.

**B. Motion to Limit Testimony of William D. Griffin**

Ole Brook argues that William Griffin, a petroleum engineer, should be prohibited from offering any expert testimony with respect to Solstice's damages. (Rec. Doc. 228-1) Ole Brook does not take issue with Griffin's qualifications, but rather argues that Griffin's damages opinion is inadmissible because it is not based on sufficient facts or data and is not the product of reliable principles or methods. *Id.* at 4-6. According to Ole Brook, "Griffin's reliance on one daily drilling report that provides a cost estimate is wholly insufficient as a basis for [his] expert testimony on damages." *Id.* at 5. Ole Brook also argues that Griffin's "conclusory opinion" is unreliable because he does not consider potential third-party liability. *Id.* Lastly, Ole Brook argues that Griffin fails to explain the principles or methods used to form his damages opinion. *Id.* at 5-6.

In response, Solstice argues that Griffin used his extensive experience as a petroleum engineer to determine that one proper method of quantifying the damages caused by Ole Brook's conduct is to measure the costs attributable to drilling the unusable portion of the wellbore. (Rec. Doc. 235, at 4) In

13

reaching this opinion, Griffin relied on the daily drilling reports which, in his experience, are reliable resources. *Id.* Solstice denies that Griffin relied on a single daily drilling report, arguing that he reviewed all available drilling reports and many other documents before forming his opinions, as evidenced in his report. *Id.* at 6. Lastly, to the extent that actual costs may be more accurate than cumulative costs reflected in the daily drilling reports, Solstice argues that Ole Brook may attack this perceived flaw in Griffin's testimony on cross-examination. *Id.*

Among the conditions imposed by Rule 702 on the admissibility of expert opinion testimony is that the testimony be "based on sufficient facts or data." Fed. R. Evid. 702(b). The *Daubert* reliability analysis applies to all aspects of an expert's testimony, including the facts underlying the expert's opinion. *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007). In particular, an opinion based on "insufficient, erroneous information," fails the reliability standard. *Moore v. Int'l Paint, L.L.C.*, 547 F. App'x 513, 515 (5th Cir. 2013) (per curiam).

In determining the admissibility of expert testimony, the court should approach its task "with proper deference to the jury's role as the arbiter of disputes between conflicting opinions." *United States v. 14.38 Acres of Land, More or Less*

14

*Situated in Leflore Cnty., Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1996) (per curiam). The court's role as a gatekeeper "does not replace the traditional adversary system and the place of the jury within the system." *Scordill v. Louisville Ladder Grp., LLC*, No. 02-2565, 2003 WL 22427981, at *3 (E.D. La. Oct. 24, 2003) (citing *Daubert*, 509 U.S. at 596). As the Court in *Daubert* noted, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

Ole Brook's attack on the factual basis of Griffin's opinion is not a ground for exclusion. "[E]xperts sometimes reach different conclusions based on competing versions of the facts." *Moore*, 547 F. App'x at 515 (quoting Fed. R. Evid. 702 advisory committee's note). Of course, expert testimony that relies on "completely unsubstantiated factual assertions" is inadmissible. *Id.* Generally, though, the "fact-finder is entitled to hear [an expert's] testimony and decide whether . . . the predicate facts on which [the expert] relied are accurate." *Id.* (quoting *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002)). Therefore, "questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *14.38 Acres of Land*, 80

F.3d at 1077; *see also Hose v. Chi. Nw. Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1995) ("[T]he factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.").

In the instant case, Griffin reviewed a number of documents, including numerous daily drilling reports, before forming his opinions. (Rec. Doc. 235-1, at 43) Griffin used his experience as a petroleum engineer and specialized knowledge of oil and gas wells to arrive at his opinion that Ole Brook's conduct caused damages equal to the total estimated well cost, excluding the cost of drilling and installing the surface casing because it was salvageable. (Rec. Doc. 228-4, at 8) To quantify this amount of damages, Griffin relied on the daily drilling reports. *Id.* These reports show the total estimated well cost and the cost through drilling and installation of the surface casing. *Id.* Accordingly, the Court finds that Griffin's methodology is acceptable and his opinion on damages is based on sufficient facts and data.

Ole Brooke may attack any perceived flaws in Griffin's opinion through vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof. *See Daubert*, 509 U.S. at 596. It is within the province of the jury, not the *Daubert* gatekeeper, to analyze and weigh an

expert's findings to determine whether they do in fact support his conclusion. *Voth v. State Farm Fire & Cas. Ins. Co.*, No. 07-4393, 2009 WL 411459, at *5 (E.D. La. Feb. 17, 2009) (citing *Daubert*, 509 U.S. at 595). The jury will have the opportunity to determine whether Griffin's reliance on the cumulative costs reflected in the daily drilling reports, rather than actual costs, warrant disregarding Griffin's trial testimony or lessening the weight to be accorded to that testimony. *See id.* Ultimately, the jury will reach a decision as to whether Ole Brook's conduct caused Solstice damage and, if so, the amount of that damage, but it will make that decision after hearing all of the evidence. The jury is entitled to rely on Griffin's expertise should it elect to do so.

**C. Motion for Partial Summary Judgment**

Ole Brook moves for partial summary judgment on Solstice's breach of contract and negligence claims on the ground that Solstice has failed to produce competent evidence of damages caused by Ole Brook. (Rec. Doc. 229) Because Solstice employed Panzeca simply to determine and verify the costs to drill the wells, Ole Brook argues that he cannot offer any testimony with respect to damages. (Rec. Doc. 229-1, at 5) Moreover, even if Griffin is permitted to offer his opinion on damages, Ole Brook argues that this opinion "is still not sufficient." *Id.* at 6. In addition, Ole Brook cites this Court's prior Order and Reasons

granting its insurers summary judgment upon finding that the Ole Brook and Solstice failed to establish coverage under the policy. *Id.* In this regard, Ole Brook argues that it is entitled to summary judgment to the extent that this Court's prior findings demonstrate that Solstice has no claims against it "for property damage, loss of use and damage to materials and tools." *Id.* at 7.

In response, Solstice argues that there is abundant evidence of the costs Solstice incurred to drill the two wells and it is for the jury to decide what portion of those costs Solstice is entitled to recover as damages if it holds Ole Brook liable for breach of contract or negligence. (Rec. Doc. 233) It is Solstice's position that the cost of drilling Well No. 2 is a direct result of Ole Brook's breach of contract and negligence in drilling Well No. 1. According to Solstice, Griffin's testimony is that Solstice's damages should be measured by the costs associated with the portion of Well No. 1 irreparably damaged as a result of Ole Brook's conduct. *Id.* at 6. Furthermore, Solstice argues that Panzeca analyzed, quantified, allocated, and validated the costs incurred by Solstice for Well No. 1 and Well No. 2. Although Panzeca was not asked to provide an opinion as to who was legally responsible for those costs, Solstice argues that "those costs clearly are *evidence* of the damages Solstice seeks to recover." *Id.* at 7. Lastly, Solstice

18

argues that this Court's prior ruling regarding insurance coverage has no bearing on Solstice's claims against Ole Brook. *Id.* at 7-8.

The Court finds that Solstice has provided sufficient evidence of damages caused by Ole Brook's conduct. As discussed above, the Court will permit Panzeca and Griffin to testify in this matter. Griffin is Solstice's damages expert and, in his opinion, Ole Brook's conduct caused Solstice damage in an amount equal to the cost of the portion of Well No. 1 that was irreparably damaged. Griffin opines that this amount equates to approximately $5,866,694, based on his review of the daily drilling reports. (Rec. Doc. 228-4, at 8) Furthermore, Panzeca provides an opinion as to the costs incurred in drilling each well. In his opinion, Well No. 1 cost a total of $6,779,579 and Well No. 2 cost a total of $4,817,987. (Rec. Doc. 233-5, at 3) Although Panzeca does not provide an opinion on damages, his testimony as to the costs for each well is relevant when considered with Griffin's opinion on damages. Accordingly, a rational jury would be entitled to conclude that a portion of the total costs incurred by Solstice are a direct result of Ole Brook's breach of contract or negligence.

## **CONCLUSION**

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's *Daubert Motion to Exclude George J. Panzeca* **(Rec. Doc. 227)** is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's *Daubert Motion to Limit Testimony of William D. Griffin* **(Rec. Doc. 228)** is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's *Motion for Partial Summary Judgment* **(Rec. Doc. 229)** is **DENIED**.

New Orleans, Louisiana this 26th day of August, 2015.

_____
CARL J. BARBIER
UNITED STATES DISTRICT JUDGE